IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


ENRIQUE CORRALES,

       Plaintiff,

v.                                                                                 CV 13-577 WPL

CAROLYN W. COLVIN, *Acting*
*Commissioner of the Social Security*
*Administration*,

       Defendant.


**MEMORANDUM OPINION AND ORDER**

Enrique Corrales filed an application for Disability Insurance Benefits ("DIB") on July 28, 2010. (Administrative Record ("AR") 18.) He alleges disability beginning on March 21, 2010, due to diabetes, high blood pressure, an injury to his right hand, and arthritis. (AR 37, 134.) Administrative Law Judge ("ALJ") W. Thomas Bundy held a disability hearing on August 23, 2011. (AR 26-35.) On September 1, 2011, the ALJ determined that Corrales was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 18-22.) Corrales filed an appeal with the Appeals Council, but the Council declined his request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-8.)

Corrales sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Remand to Agency for Rehearing (Doc. 23). The Commissioner of the SSA ("Commissioner") responded (Doc. 25), and Corrales filed a reply (Doc. 26). After having read and carefully

considered the entire record and the relevant law, I grant Corrales's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4) (2013). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to

those in the Listing of Impairments, then, as part of step four, the ALJ determines the claimant's residual functional capacity ("RFC").  *See* 20 C.F.R. §§ 404.1520(e). In the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

## FACTUAL BACKGROUND

Corrales is a fifty-eight-year-old man with a third-grade education. (AR 135.) He worked in a hatchery, feeding and attending to chickens, cleaning cages, inspecting egg production, using a tractor to clean chicken waste, and operating a forklift, from 1993 to 2010. (AR 135-36.) On March 20, 2010, the hatchery shut down, causing Corrales to stop working. (AR 134.) He asserted that his medical conditions became severe enough to keep him from working on March 21, 2010. (*Id.*)

The AR contains medical records dating from May 4, 2007, to July 27, 2011. Corrales visited the Mt. West Family Health Center ("Mt. West") until 2009 for type 2 diabetes mellitus, hypertension, coronary artery disease, hyperlipidemia, and high cholesterol. Blood tests on May 4, 2007, revealed that Corrales had "poor control" of his diabetes, and his hemoglobin A1c test

was in the diabetic range at 7.9%. (AR 225.) Corrales's hemoglobin A1c test was even higher, at 8.8%, on July 13, 2007. (AR 221.) On July 18, 2007, Victor M. Villalobos, M.D., examined Corrales and assessed him with poorly controlled diabetes, uncontrolled hypertension, and high cholesterol. (AR 220.)

On October 11, 2007, Corrales had a Myoview nuclear stress test in order to assess for coronary artery disease following an abnormal EKG. (AR 212.) The results of the stress test were abnormal, and Michael Gutierrez, M.D., concluded that Corrales had coronary artery disease unless proven otherwise. (AR 212-13.) During a follow up visit with Dr. Gutierrez on November 27, 2007, Corrales's extremities showed no cyanosis, clubbing, or edema, and his musculoskeletal system showed no deformities. (AR 207.)

On February 14, 2008, Enoch E. Agunanne, M.D., saw Corrales and noted that he had not completed ordered lab tests due to the cost. (AR 205.) During a follow up visit at Mt. West on June 10, 2008, Cesar I. Sandate, P.A.-C., found that Corrales had type 2 diabetes mellitus, hypertension, high cholesterol, asymptomatic coronary artery disease, and obstructive sleep apnea. (AR 202.) Sandate refilled Corrales's medications, including Zocor, metformin, glipizide, and lisinopril (AR 197) and referred him to a cardiologist to follow up on his coronary artery disease (AR 202).

Sandate examined Corrales again on October 8, 2008, diagnosing Corrales with hematuria in addition to his ongoing ailments. (AR 195.) On October 31, 2008, Corrales had a diabetic retinol exam and was diagnosed with diabetes mellitus with mild non-proliferative retinopathy in both eyes. (AR 187, 189.)

On November 7, 2008, Corrales followed up with Sandate, who assessed him with hematuria, type 2 diabetes mellitus, urinary tract infection, hypertension, coronary artery disease,

and diabetic retinopathy. (AR 190.) Corrales's lab tests showed elevated hemoglobin A1c, LDL cholesterol, and glucose. (AR 192-94.) Corrales saw Sandate again on December 19, 2008, complaining of pain in his feet when walking. (AR 184.) A vibratory sense test to the feet was abnormal, and the feet also revealed edema and tenderness. (*Id.*)

Corrales visited Mt. West again on March 11, 2009, where he was seen by Lena L. Lewis, P.A.-C. (AR 183.) Lewis assessed him with hypertension, type 2 diabetes mellitus, and hyperlipidemia, and she explained the need to follow his diet and control his blood sugar. (*Id.*) Corrales followed up with Lewis on March 25, 2009, and on April 28, 2009, feeling well at both visits. (AR 181-82.) On August 3, 2009, Corrales signed a refusal to undergo ABl and microalbumin tests at Mt. West. (AR 180.)

Corrales began treatment at a new clinic, La Clinica De Familia ("La Clinica") on June 22, 2010, and saw Joseph Ewing, M.D. (AR 231.) Corrales stated that he had muscular pain that he treated with naproxen and had good results. (*Id.*) He asserted that his fingertips were a little numb sometimes but that his feet were generally feeling alright. (*Id.*) Dr. Ewing observed onychodystrophy (malformation) of the nails, and Corrales's lab results showed an abnormal A1c of 9.2% (AR 232) and high glucose and triglycerides levels (AR 235). Dr. Ewing assessed Corrales with benign essential hypertension, diabetic nephropathy, hyperlipidemia, uncomplicated and uncontrolled type 2 diabetes mellitus, and no acute ischemia. (AR 232.) Dr. Ewing found no decreased response to tactile stimulation of the soles of the feet, no peripheral neuropathy, no cyanosis, and no clubbing or acropachy of the fingers. (*Id.*)

On July 6, 2010, Corrales visited Cecilia M. Tellez, M.D., at La Clinica. He complained of right shoulder pain resulting from a fall two months earlier. (AR 228.) Corrales's right shoulder rotator cuff was tender to palpation, and Corrales experienced pain from a reverse

impingement test and crossed arm impingement test. (AR 229.) He showed a marked decrease in range of motion upon flexion and abduction of the right shoulder, though he exhibited full strength. (*Id.*) Dr. Tellez assessed Corrales with essential hypertension, hypercholesterolemia, poorly controlled diabetes mellitus, and a right rotator cuff sprain. (*Id.*) She referred him to radiology for an MRI of his right shoulder. (*Id.*)

Lab tests on September 8, 2010, showed a high microalbumin to creatine ratio, indicating microalbuminuria. (AR 247.) Corrales continued to have high A1c and glucose levels as well. (AR 247-48.)

On October 1, 2010, Corrales was seen again by Dr. Tellez. (AR 239.) Corrales denied pain at that time and stated that he had not gotten an MRI because he could not afford the study. (*Id.*) He reported that he took all of his medications as prescribed but wanted to know if he could substitute something less expensive for metoprolol. (*Id.*) Dr. Tellez found an abnormal sclerotic tympanic membrane and assessed him with hypertensive kidney disease and uncontrolled type 2 diabetic nephropathy. (AR 242.) She prescribed amlodipine to replace Corrales's metoprolol prescription. (*Id.*)

Corrales visited Dr. Ewing on January 21, 2011. (AR 263.) He complained of back pain, with his shoulders and neck hurting the most, rating his pain at a three out of ten. (*Id.*) Further, Corrales could not obtain dental treatment because his blood pressure was too high. (*Id.*) Upon examination, Dr. Ewing found that Corrales's shoulders showed no abnormalities, that his range of motion and strength were good in the shoulders and arms, and that his gait and stance were normal. (AR 265.) Dr. Ewing assessed him with benign essential hypertension, myalgia, myositis, and type 2 diabetes mellitus with complication and noted that if Corrales's sugar did not improve, insulin might be needed. (*Id.*)

On February 14, 2011, Corrales saw Dr. Tellez for a follow up on his blood pressure, and he also complained of pain in his legs, with his right leg hurting more than his left. (AR 260.) Dr. Tellez noted that his legs would hurt less once his diabetes was under better control. (AR 262.) On May 19, 2011, Corrales exhibited a decreased response to tactile stimulation of the left sole of his left foot, though there were no other physical abnormalities. (AR 297.) Corrales admitted that he often missed his second dose of diabetes medication due to eating dinner at his daughter's house. (AR 294.) His A1c test was worse, at 10.6%. (AR 297.) Dr. Tellez assessed him with hypertensive kidney disease, uncontrolled type 2 diabetes with neurological complications and renal manifestations, and noncompliance with medical treatment. (*Id.*)

Corrales visited Dr. Tellez on June 9, 2011, to have her complete a medical assessment form (AR 292) and again on July 27, 2011, for a follow up (AR 290-91). Dr. Tellez refilled his clonidine and lisinopril prescriptions at that time. (AR 291.) His other medications included amlodipine besylate, aspirin, glipizide, hydrochlorothiazide, metformin, naproxen, and simvastatin. (AR 290.)

### HEARING TESTIMONY

The ALJ held a hearing on August 23, 2011, at which Corrales testified. (AR 28-35.) Corrales was represented by an attorney at the hearing. (AR 28.)

Corrales testified that he left his job of seventeen years because the factory closed and because he could not do the job anymore. (AR 29.) Corrales thereafter applied for unemployment benefits, though he testified that he was not looking for work. (AR 29-30.) He performed work at the medium exertional level at the hatchery but asserted that even if the plant had not closed, he would not be working there due to pain in his legs and arms. (AR 30.)

7

Corrales explained that La Clinica provides him with free medical services, prescribing medications for all of his ailments, including his diabetes. (*Id.*; AR 32.) His symptoms at the time of the hearing included affected vision; headaches; troubles sleeping; stomach problems; dizziness; pain in his legs, arms, back, and shoulders (worst pain there); and depression. (AR 30-31, 34.)

Corrales testified that he lives with his wife. (AR 31.) He occasionally drives, but his wife usually drives instead due to his sleepiness. (*Id.*) During a regular day, Corrales wakes up with leg and arm pain, gets up and walks around the house, eats breakfast, walks around the house again, watches television, feeds his dog and cat, rests, washes a couple of dishes and checks the mail if his wife is not home, eats lunch, sits or sleeps, gets up and walks around, rests, watches television, eats dinner, and rests again. (*Id.*)

Corrales testified that he has pain in his arms and has trouble lifting them over his head. (AR 32.) He testified that he likely has arthritis in his shoulders and might need an operation in the future; however, there is no one to pay for it. (*Id.*) If his diabetes continues to worsen, he will need dialysis because his kidneys are deteriorating. (AR 33.) Corrales also testified that his doctors were telling him that his nerves were being affected by his diabetes. (*Id.*) His left hand and his left foot hurt the most at the time of the hearing. (*Id.*) Corrales stated that he could only stand for fifteen to twenty minutes, that he could not lift anything off of the floor, that he could lift a maximum of eight or nine pounds, that he could sit for thirty to forty-five minutes without pain or discomfort, and that he could only walk two blocks. (AR 33-34.)

The ALJ did not request vocational expert testimony.

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Corrales's application for benefits according to the sequential evaluation process. (AR 20-22.) At the first step, the ALJ found that Corrales had not engaged in substantial gainful activity since March 21, 2010, the alleged onset date. (AR 20.) Then, at the second step, the ALJ concluded that he suffers from the severe impairments of hypertension, type 2 diabetes mellitus, and diabetic neuropathy. (*Id.*) At step three, the ALJ found that Corrales's combination of severe impairments did not equal one of the listed impairments. (*Id.*)

As part of step four, the ALJ then determined that Corrales has the RFC to lift or carry fifty pounds occasionally and twenty-five pounds frequently, stand or walk for six hours in an eight-hour workday, and sit for two hours in an eight-hour workday. (AR 20-21.) In making this finding, the ALJ acknowledged Corrales's testimony at the hearing. (AR 21.) However, he noted that La Clinica examinations indicated that Corrales had a normal gait, that he had no abnormalities of the range of motion in his shoulders and arms, and that he was noncompliant in taking his medication. (*Id.*) Further, the ALJ found that Corrales had described daily activities that are not limited to the extent one would expect given Corrales's subjective complaints and alleged limitations. (AR 21-22.) The ALJ also suggested that Corrales's noncompliance in taking some of his medications may mean that his symptoms were not actually as limiting as alleged. (AR 22.)

The ALJ concluded that Corrales could perform past relevant work as a hatchery laborer, which is medium exertional level, unskilled work. (*Id.*) As the ALJ determined that Corrales could perform past relevant work, the ALJ concluded that Corrales was not eligible for benefits. (*Id.*) Corrales appealed the decision to the Appeals Council, but the Council found that

Corrales's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-8.)

## DISCUSSION

Corrales raises a single challenge to the ALJ's decision to deny DIB benefits. He argues that the ALJ's RFC findings were not supported by substantial evidence because he failed to link his findings to specific evidence in the record and because the record contained no opinion evidence regarding Corrales's ability to work.

Citing SSR 96-8p, Corrales argues that when the ALJ fails to describe how the evidence supports each conclusion, referring to specific medical facts and nonmedical evidence, his RFC findings are not supported by substantial evidence. 1996 WL 374184, at *7 (July 2, 1996). Specifically, Corrales argues that the ALJ did not indicate which evidence supported his finding that Corrales could lift or carry fifty pounds occasionally and twenty-five pounds frequently. Corrales states that he testified that he could only lift up to nine pounds and that no medical source opined as to the amount of weight he could lift or carry. Corrales also argues that the ALJ failed to cite any evidence that Corrales could stand or walk for six hours in an eight-hour workday, another finding contrary to Corrales's own testimony. Corrales asserts that the record contained no opinion from a medical source as to the ALJ's ability to work, further compounding the ALJ's errors.

Corrales suggests that the ALJ should have further developed the record so that he had a basis upon which to make proper RFC findings. Corrales requests that I remand the case, instructing the ALJ to either obtain a consultative examination under 20 C.F.R. § 404.1519a that includes a statement regarding Corrales's abilities despite his impairments, recontact treating

sources to obtain opinions as to Corrales's RFC, and/or obtain a medical expert to testify at the rehearing with respect to Corrales's physical RFC as reflected from the record.

The Commissioner responds that it was Corrales's burden to provide evidence establishing functional limitations imposed by his impairments and that other than subjective complaints, Corrales showed no evidence that his impairments imposed limitations precluding his performance of medium work. The Commissioner outlines evidence from the record, most of which was not included in the ALJ's decision, which she claims shows that Corrales is capable of performing medium work. Finally, the Commissioner argues that the ALJ properly devalued Corrales's claims because of the inconsistencies between the record and Corrales's subjective complaints.

According to SSR 96-8p, "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."[1] 1996 WL 374184, at *7. In making the RFC determination, the ALJ is required to evaluate all of the relevant evidence in order "to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." *Carpenter v. Astrue*, 537 F.3d 1264, 1269 (10th Cir. 2008) (internal quotations omitted). Nonetheless, the need for an express analysis of every piece of evidence is less as to evidence that the ALJ need not reject or weigh unfavorably to determine the applicable RFC. *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004).

In his decision, the ALJ mentioned medical records from La Familia and the reasons for Corrales's treatment at the facility. (AR 21.) He wrote that examination notes indicated that

---

[1] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

11

Corrales had a normal gait, that he had no abnormalities of the range of motion in his shoulders and arms, and that Corrales had been noncompliant in taking his medications. (*Id.*) The ALJ also listed some of Corrales's medications. (*Id.*) Such comments were the full extent of the ALJ's discussion of the material in the AR from medical sources.

The ALJ neglected to examine medical findings such as Corrales's abnormal vibratory sense test (AR 184), Dr. Tellez's recognition of Corrales's leg pain and her comments that Corrales's legs would hurt less once his diabetes was under control (AR 262), and Corrales's decreased response to tactile stimulation of the left sole of his left foot (AR 297), among other examples. An ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (citation omitted). In the absence of findings supported by a specific weighing of the evidence, it is impossible to assess whether the ALJ's decision is supported by substantial evidence. *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). Furthermore, despite the Commissioner's post-hoc arguments in support of the ALJ's decision, the ALJ himself must reference those parts of the AR that support his conclusions. *Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011) (citing *Hamlin*, 365 F.3d at 1217).

In addition to picking and choosing the evidence to consider, the ALJ failed to "describ[e] how the evidence supports each [RFC] conclusion." SSR 96-8p, 1996 WL 374184, at *7. The ALJ's decision provides no link between his slim description of the evidence and his conclusion that Corrales can lift or carry fifty pounds occasionally and twenty-five pounds frequently, stand or walk for six hours in an eight-hour workday, or sit for two hours in an eight-hour workday. In *Fleetwood*, the court found that other than a brief work restriction imposed on the claimant immediately following a surgery, none of her other medical records contained any

information as to her ability to work. *Fleetwood v. Barnhart*, 211 F. App'x 736, 740 (10th Cir. 2007) (unpublished). The court stated that the record was "therefore insufficient to draw reliable conclusions about her ability to work." *Id.* The court continued, "To the extent that there is very little medical evidence directly addressing [claimant's] RFC, the ALJ made unsupported findings concerning her functional abilities. Without evidence to support his findings, the ALJ was not in a position to make an RFC determination." *Id.* Similarly, in *Adkins*, the court emphasized that "[o]f crucial importance to this case is that no doctor has ever defined claimant's capability for walking, standing, or sitting . . . . There is a total lack of evidence about what he can do." *Adkins v. Barnhart*, 80 F. App'x 44, 48 (10th Cir. 2003) (unpublished). Likewise, in this case, no doctor ever described Corrales's ability to lift, carry, stand, walk, or sit throughout an eight-hour workday. Without evidence available to support an RFC finding, the ALJ's conclusions are not supported by substantial evidence. *See id.* at 49.

"[A]n ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994). Courts have found that where the record did not contain sufficient evidence upon which to make an RFC finding, the ALJ should have recontacted the claimant's treating physicians for additional information or sent the claimant to undergo a consultative examination at the Commissioner's expense. *See Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997); *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993); *Dewey v. Barnhart*, 178 F. App'x 794, 799 (10th Cir. 2006) (unpublished) (citing 20 C.F.R. §§ 404.1512(e), 404.1512(f); *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002)); *Adkins*, 80 F. App'x at 48-49. Because I find that the record lacks sufficient evidence to make an RFC finding, I find grounds to remand the case so that the ALJ may recontact treating sources to request

additional information as to Corrales's abilities or obtain a consultative examination pursuant to 20 C.F.R. § 404.1519a.

## CONCLUSION

I grant the motion to remand this case because the record did not contain sufficient evidence to support an RFC finding and was also therefore not based on substantial evidence. I instruct the ALJ to recontact Corrales's treating sources to obtain additional information as to Corrales's abilities and/or to order a consultative examination at the Commissioner's expense. In addition, I instruct the ALJ not to pick and choose among the evidence to support a particular outcome but rather to consider all of the available medical evidence and to provide a narrative discussion describing how the evidence supports each RFC conclusion.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

14

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.